UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| LADELLA FRANCE | ) | |
| | ) | |
| V. | ) | NO. 2:15-CV-218 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's applications for disability insurance benefits and supplemental security income under the Social Security Act were administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. Plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 19], while the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 24].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor

resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

In a previous case, *France v. Colvin, Acting Comm. Of Soc. Sec.*, No. 2:13-CV-198 (E.D.TN. 2014), a prior adverse hearing decision regarding plaintiff's applications was remanded to the Commissioner for further evaluation based upon a finding that the Residual Functional Capacity ["RFC"] finding therein was not based on substantial evidence. *Id.*, [Doc. 18]. The plaintiff was a younger individual under the regulations at all pertinent times. She has a GED high school equivalency education. There is no dispute that she cannot return to any of her past relevant work.

Plaintiff's medical history is summarized in the Commissioner's brief as follows:

> In December 2005, a magnetic resonance imaging (MRI) scan of Plaintiff's lumbar spine showed a moderately prominent relatively focal disc herniation of T11-T12 on the right with impression on the adjacent spinal cord (Tr. 280). MRI scans of her hips were negative (Tr. 281-82). A May 2008 MRI scan of her right shoulder showed a paralabral cyst adjacent to the posterior superior aspect of the glenoid labrum associated with a SLAP-type tear of the superior labrum, some chronic tendinosis change within the supraspinatus tendon, and some capsular hypertrophy of the acromioclavicular joint, which produced some mass effect upon the musculotendinous junction (Tr. 214-15).
> Beginning in April 2010, Plaintiff sought primary care from S. Krishnamoorthy, M.D., for elevated blood sugar, hypertension, old shoulder injury, epicondylitis, diabetes mellitus, and weakness (Tr. 264-65). She returned

in April, May, and July 2010 for blood pressure checks and medication refills (Tr. 258-65). A DEXA bone density study done in August 2010 showed normal bone density, without increased fracture risk (Tr. 334-39). Plaintiff returned in August, November, and December 2010, for medication management (Tr. 328-33).

In August 2010, Donna Abbott, M.A., and B. Wayne Lanthorn, Ph.D., performed a consultative psychological evaluation of Plaintiff (Tr. 287-91). In describing her activities of daily living, Plaintiff reported she used a computer, cooked, did some grocery shopping, attended church, and helped her mother who had cancer (Tr. 289). Based on their assessment, the examiners diagnosed adjustment disorder with depressed mood and a global assessment of functioning score of 60 (Tr. 290). They stated Plaintiff could understand and remember and that her estimated intellectual functioning was average (Tr. 290). She could attend and concentrate and should be able to maintain a basic routine (Tr. 290). Her social interaction did not appear to be significantly limited, and her general adaption skills showed mild limitation (Tr. 290). She could be aware of simple hazards and take precautions and could drive and travel alone (Tr. 290). She should be able to set goals and make plans to achieve these goals (Tr. 290). She should be able to work in proximity to others and work a regular workweek (Tr. 290). She may have mild difficulty adapting to change and dealing with stress (Tr. 290).

Also in August 2010, Samuel Breeding, M.D., performed a consultative medical examination (Tr. 293-95). On physical examination, Plaintiff's gait and station were normal and she used no assistive devices (Tr. 294). She had normal to slightly guarded range of motion of her shoulders bilaterally and of her hips (Tr. 294). Lumbar forward flexion was guarded beyond 60 degrees (Tr. 294). Sitting straight leg raise test was negative at 90 degrees (Tr. 294). Range of motion of all other joints was normal (Tr. 294). Muscle strength was 5/5 in all major muscle groups (Tr. 294). Plaintiff's cranial nerves were intact, her deep tendon reflexes were 2+/4, and she had reported no sensory deficits (Tr. 295). Dr. Breeding assessed low back pain, arthralgias, history of depression, and diabetes (Tr. 295). He opined that during an 8-hour workday, Plaintiff could lift at least 15 pounds occasionally, sit 4 to 6 hours, and stand 4 to 6 hours (Tr. 295).

In September 2010, State agency psychological consultant Jeffrey Bryant, Ph.D., opined that the evidence showed no significant change since the ALJ's June 8, 2007 findings (Tr. 297-99). Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace (Tr. 310). She was not significantly limited in her ability to understand and remember, sustain concentration and persistence, and adapt (Tr. 314-15). She could relate with peers and supervisors and infrequently with the public (Tr. 314-15). Also in September 2010, State agency medical consultant Reeta Misra, M.D., opined that Plaintiff could perform medium work, except she was limited to frequently reaching overhead bilaterally due to her shoulders (Tr. 318-26). Plaintiff could lift and carry 50 pounds occasionally, 25 pounds frequently, and could sit, stand, or walk

3

for 6 hours during an 8-hour workday (Tr. 319).

Beginning August 4, 2010, Plaintiff sought care from the Pain Center of Kingsport for diagnosis of piriformis syndrome, cervicalgia, lumbago, herniation T11-T12, shoulder osteoarthritis, and myofascial pain syndrome (Tr. 340-46, 350-81, 397-442). Barry Bichon, D.O., performed monthly trigger point injections in Plaintiff's tender spots through March 2011, and Plaintiff reported some improvement, ranging from 10 percent improvement that lasted for three weeks to 75 percent improvement that lasted three days (Tr. 341-45, 350-56, 358-63, 365-68, 370-73, 375-78, 380-81). Upon physical examination, Plaintiff had tender areas and guarded or limited range of motion, but her muscle strength and gait were within normal limits, and her sensation was intact (Tr. 341, 344, 358, 365, 370, 375, 380).

In December 17, 2010, x-rays of the cervical spine demonstrated limited range of motion, but otherwise was normal (Tr. 340). The heights of the vertebral bodies and discs were maintained and the neural foramen were widely patent (Tr. 340). Cervical spine nerve conduction study of January 17, 2011, showed very severe findings at C5-T1 and moderate findings at T2 (Tr. 431). A lumbar spine MRI scan that month showed protrusion at T11-T12, L3-4 moderate facet hypertrophy, L4-5 facet hypertrophy, and L5-S1 annular bulge (Tr. 397-98).

In January 2011, on reconsideration review of Plaintiff's claim, State agency psychological consultant Robert de la Torre, Psy.D., affirmed Dr. Bryant's findings as written (Tr. 347). In February 2011, on reconsideration review, State agency medical consultant Nathanial Robinson, M.D., affirmed Dr. Misra's findings as written (Tr. 348).

Plaintiff established primary care at ETSU Family Physicians of Kingsport (ETSU) in August 2011 (Tr. 388-90). She was assessed with depression, skin abscess of the thigh, benign essential hypertension, edema, and obesity (Tr. 389-90). The next month, she was seen for medication management for hypertension and type 2 diabetes mellitus (Tr. 383-87).

Plaintiff resumed monthly trigger point injections from Dr. Bichon in July 2011 (Tr. 399-404, 406-09). She continued to report some improvement, and her physical examination was unchanged (Tr. 399, 401, 406). Electrodiagnostic report of October 17, 2011 revealed no hypoesthetic findings suggesting pathology (Tr. 433). In October, November, and December 2011, Plaintiff continued to report improvement after injections (Tr. 413-30).

On January 19, 2012, Steven Baumrucker, M.D., conducted an independent medical examination (Tr. 439-41). His impressions were cervical radiculopathy, chronic spinal arthritis, thoracic radiculopathy, T11-T12 right-sided nerve root encroachment, diabetes mellitus (type 2), SLAP tear of right shoulder, and depression (Tr. 440). He stated Plaintiff could not perform light activities of daily living and had been unable to find employment that could accommodate her need for frequent position changes and "time out" periods (Tr. 441). Her depression affected her ability to socialize (Tr. 441). He opined she could lift no more than 10 pounds (infrequently), stand for up to 5 minutes, walk

4

for 10 minutes, and sit for 30 minutes at a time before changing position (Tr. 441). She needed to lie down two to three times per day (Tr. 441). She would have difficulty stooping, climbing, standing, and sitting, and was, therefore, unemployable as a laborer (Tr. 441). He stated she was not able to perform full-time work at any level and was not able to work without having to withdraw several times a day (Tr. 441).

Plaintiff submitted additional medical evidence following remand. She went to the emergency room in March 30, 2012, with nausea, vomiting, and diarrhea (Tr. 871-73). Her blood glucose was greater than 500, and she was admitted to the hospital (Tr. 871-73). She was started on a clear liquid diet and was discharged the next day (Tr. 873, 876).

On April 10, 2012, Plaintiff followed up with the ETSU doctors after her recent hospitalization and to get her medications refilled (Tr. 819-22). Her previous appointment had been six months earlier in September 2011 (Tr. 383-87). Upon examination, Plaintiff appeared healthy, overweight, and well-hydrated (Tr. 821). Her gait and station were normal (Tr. 821). Her psychiatric examination was normal, with normal judgment, insight, and memory (Tr. 821). Her observed mood and affect was pleased and calm (Tr. 821). The ETSU doctor refilled Plaintiff's medications (Tr. 822).

Dr. Bichon performed trigger point injections in July and August 2012 (Tr. 752-54, 757-59). Plaintiff had tenderness and guarded range of motion, but her strength and gait were normal and she had intact sensation (Tr. 752). Dr. Bichon continued to perform monthly injections through July 2013, and Plaintiff continued to report some improvement (Tr. 688-720).

Four months after her last visit, Plaintiff returned to ETSU in August 2012 for follow-up of depression and anxiety (Tr. 815). She stated her medications were not working after multiple deaths of people close to her, including her mother, a lady she took care of for 25 years, and her husband who had been "gunned down by Kingsport police" (Tr. 815). The ETSU doctors thought Plaintiff had poor insight into why her husband was shot (Tr. 817). Her observed mood and affect were angry, excessive crying, anxious, grieving, despairing, and tearful (Tr. 817). The ETSU doctors assessed recurrent major depression and grief reaction, and prescribed medication (Tr. 818). Plaintiff met with the office social worker for counseling (Tr. 818).

Seven months after her last visit, Plaintiff returned to ETSU doctors in March 2013 (Tr. 810-14). Plaintiff was extremely sad about her husband's death in May 2012 (Tr. 810). She was having nightmares of the shooting and regrets that she never saw his body after he died (Tr. 810). Plaintiff was very tearful throughout the visit (Tr. 810). She indicated that sometimes she would like to go to sleep and never wake up though she had never contemplated hurting or killing herself (Tr. 810). On examination, her mood and affect were inappropriate, angry, anxious, depressed, excessive crying, and sad (Tr. 812). The ETSU doctors assessed posttraumatic stress disorder (PTSD), fatigue, and major depression (Tr. 813-14). Later that month, Plaintiff followed up with ETSU doctors for dizziness,

5

fatigue, and depression (Tr. 803-08). The next month, Plaintiff reported continued depression related to her husband's death (Tr. 798). Her musculoskeletal examination was normal, with normal gait and station, full range of motion in all extremities, and 5/5 strength throughout (Tr. 800). The doctors assessed recurrent major depression and referred Plaintiff to psychiatry (Tr. 802).

Three months later, in June 2013, Plaintiff told ETSU doctors that she was doing "okay," but felt worse since she had been denied disability the week prior (Tr. 794). Though counseling had been helpful, she had been too busy to schedule an appointment to meet with the office social worker (Tr. 794). She reported that for the past three days, her right thumb had hurt whenever she moved it (Tr. 794). She was still able to do her normal activities of daily living because she was left-handed, and had not taken anything for pain (Tr. 794). Upon examination, Plaintiff had soft tissue swelling over the dorsal aspect of the right forearm with pain on palpation of the right thumb as well as with right thumb range of motion (Tr. 796). There was positive Finkelstein's testing and negative Phalen testing (Tr. 796). She had limited range of motion of the right thumb due to pain (Tr. 796). ETSU doctors assessed recurrent major depression, de Quervain's tenosynovitis, and PTSD (Tr. 797). They thought she would benefit from psychiatric follow-up, as well as regular counseling (Tr. 797). They also prescribed a thumb splint (Tr. 785, 797). The next month, Plaintiff reported right hand pain, anxiety, sleep disturbances, and depression (Tr. 791). She reported she had attended counseling at Frontier Health and that it was helpful (Tr. 790).

In August 2013, ETSU doctors assessed lower back pain and de Quervain's tenosynovitis (Tr. 787-89). Upon physical examination, Plaintiff had tenderness at the distal portion of the radius of her right forearm and 4/5 grip strength (Tr. 788). The doctor prescribed Meloxicam and referred Plaintiff to a pain clinic (Tr. 789). She recommended continued splinting and an injection for de Quervain's tenosynovitis (Tr. 789). Plaintiff reported comfort and some relief from the brace, which had good proper fit and offered support for Plaintiff's wrist (Tr. 784).

In September 2013, Plaintiff's back was tender to palpation at the thoracic and lumbar spines with full range of motion at flexion, limited extension, negative straight leg raise, sacroiliac joint bilateral tenderness and positive FABER bilaterally at the sacroiliac joint (Tr. 865). The ETSU doctors assessed de Quervain's tenosynovitis, lower back pain, and generalized osteoarthritis of multiple sites and prescribed opioid pain medications (Tr. 865).

On October 15, 2013, Robert Blaine, M.D., performed a consultative medical examination of Plaintiff (Tr. 840-42). Plaintiff alleged back pain, carpal tunnel syndrome, diabetes, and arthritis (Tr. 840). On examination, Plaintiff was well-kempt, had a pleasant affect, and gave a reasonable effort to comply with the examination (Tr. 841). She was left-handed and did not use any assistive device (Tr. 841). She got on and off the examination table without difficulty (Tr. 841). Cervical spine flexion was normal, extension was 15 degrees, lateral rotation was 50 degrees to either side, and lateral flexion was 20 degrees to either side (Tr.

6

841). She had full range of motion of the shoulders bilaterally except that internal rotation was 30 degrees bilaterally (Tr. 841). She had positive Tinel and Phalen's signs bilaterally (Tr. 841). Hip flexion was 90 degrees bilaterally, internal rotation was 20 degrees bilaterally, external rotation was normal bilaterally, abduction was normal bilaterally, and adduction was normal on the right and 10 degrees on the left (Tr. 842). All other joints including the thoracolumbar spine were normal (Tr. 842). Sensation was intact to light touch in all four extremities and was symmetrical (Tr. 842). Grip strength was 3/5 in the right hand and 5/5 in the left hand (Tr. 842). Flexor and extensor strength of both upper and lower extremities was 5/5 (Tr. 842). Straight leg raise testing produced low back pain at 80 degrees bilaterally (Tr. 842). Examinations of Plaintiff's gait and station, tandem walk, heel and toe walk, single leg stand, and squatting were normal (Tr. 842). Lumbar spine x-rays were unremarkable (Tr. 843). Dr. Blaine diagnosed back pain, bilateral carpal tunnel syndrome, diabetes, and arthritis (Tr. 842). He assessed that during an 8-hour workday, Plaintiff could lift and carry 30 pounds infrequently and 5 pounds frequently, stand or walk for 4 hours, and sit for 8 hours, with reasonable rest breaks (Tr. 842).

On November 29, 2013, B. Wayne Lanthorn, Ph.D., performed a consultative psychological examination (Tr. 844-48). He diagnosed adjustment disorder with mixed anxiety and depressed mood, rule out somatization disorder not otherwise specified, and rule out PTSD, with a GAF score in the range of 61-65 (Tr. 847-48). Plaintiff reported daily activities including doing the laundry, cooking, and cleaning (Tr. 846). She went to the grocery store with help (Tr. 846). She socialized with her son and her neighbors (Tr. 846). She watched some television, but rarely read (Tr. 846). Dr. Lanthorn found Plaintiff's allegations of psychologically disabling conditions to be only partially credible (Tr. 848). Plaintiff's communication skills were good (Tr. 848). Her affect was rather flat and blunt and she cried frequently (Tr. 848). She appeared to have been somewhat traumatized by her husband being shot, but Dr. Lanthorn stated it was unclear whether the trauma rose was full-fledged PTSD (Tr. 848). He opined that Plaintiff was functioning between the low average and average rangeintellectually (Tr. 847-48). She could learn simple and moderately complicated tasks in the workplace (Tr. 848). She would have mild limitations interacting with others in the workplace and in sustaining concentration and effectively persisting at tasks (Tr. 848). She would have mild or possibly greater limitations in dealing with the changes and requirements of the workplace, depending upon the circumstances and the day (Tr. 848).

When seen in October 2013, Plaintiff complained of back pain after falling two to three weeks earlier (Tr. 859). ETSU doctors assessed generalized osteoarthritis of multiple sites and referred Plaintiff to a pain medicine clinic since her current pain clinic stopped taking her insurance (Tr. 862). She was to follow-up with her primary care physician for pain medication management (Tr. 862). She returned four days later, stating she had fallen onto her bottom three weeks earlier while trying to move a loveseat (Tr. 854). Sitting worsened the pain in her

7

bottom, which exacerbated her chronic pain, and made it more difficult for her to accomplish everyday tasks (Tr. 854). She reported that she had been evaluated in the emergency department for possible fracture, but there was no fracture (Tr. 854). On examination, she had back pain and pain with range of motion, but no midline tenderness to palpation over the vertebra (Tr. 855). The bilateral paraspinous musculature had increased tone with diffuse tenderness to palpation (Tr. 855). Straight leg raise testing and FABER testing were negative although worsened lower back pain (Tr. 855). She had appropriate mood and affect (Tr. 855). The ETSU doctor assessed lower back pain, type II diabetes mellitus, benign essential hypertension, and allergic rhinitis (Tr. 857). She discussed the necessity for Plaintiff to move on a regular basis to prevent loss of function, even when moving temporarily worsened her pain, since moving would prevent some worsening long term (Tr. 857). She refilled Plaintiff's medications (Tr. 857).

    At the end of November 2013, Plaintiff was seen for an acute exacerbation of shoulder pain and general achiness after falling (Tr. 849). She was emotional on examination (Tr. 851). Examination of Plaintiff's right shoulder revealed nonspecific right lateral tenderness to palpation with full range of motion (Tr. 851). Plaintiff's right upper extremity was neurovascularly intact (Tr. 851). Given her inability to pursue pain medicine clinic at that time, the ETSU doctors started Plaintiff on a short course of lowering narcotics that was to be discontinued (Tr. 852). For depression, she was prescribed Prozac (Tr. 852).

    Plaintiff's next medical record was more than one year later in November 2014 (Tr. 877-79). Treatment records from the Hawkins County Health Department showed laboratory results of a high serum glucose of 362 (with reference interval of 70-99) and a hemoglobin A1C of 12.2 (with reference interval of 4.8-5.6) (Tr. 877, 887-89). She was assessed with diabetes, hypertension, dental abscess, smoker, and history of high cholesterol (Tr. 879). In January 2015, assessments included uncontrolled diabetes, hypoglycemia times two, hypertension, carpal tunnel syndrome, possible to fracture, and probable osteoarthritis of thumb (Tr. 883). When seen in March 2015, Plaintiff's blood sugars were much better (Tr. 880). Her serum glucose continued to be high at 236 with an A1C of 8.4 (Tr. 884-85). She was assessed with diabetes, hypertension, allergic rhinitis, and shoulder injury (Tr. 881).

[Doc. 25, pgs. 3-13].

At the administrative hearing on May 29, 2015, the ALJ took the testimony of Dr. Bentley Hankins, a Vocational Expert ["VE"]. After Dr. Hankins identified the characteristics of plaintiff's past relevant work, the ALJ asked him a series of hypothetical questions. First, he asked him to assume an individual who was 49 years of

8

age, with a GED, and the plaintiff's past relevant work experience. He also asked the VE to assume the person had the exertional limitations set out in Exhibit B23F, which is the report of Dr. Blaine described hereinabove. He then asked Dr. Hankins if there were jobs such a person could perform. The VE stated that those limitations would impose "a significant reduced range of light exertion, because [Dr. Blaine] opined the claimant could stand or walk for up to four hours and lift or carry five pounds frequently." (Tr. 488). While those limitations would preclude any of plaintiff's past relevant work, the VE opined she could perform thousands of jobs in the regional and national economies. (Tr. 488-489).

The ALJ then asked Dr. Hankins to assume the plaintiff also had the mental functioning limitations set out in Dr. Lanthorn's report, Exhibit B24F. After the VE stated what Dr. Lanthorn's limitations on plaintiff were, he opined that those limitations would not ordinarily prevent one from performing the essential functions of unskilled employment such as the jobs he had just identified. (Tr. 489).

When asked by plaintiff's counsel if one added to the hypothetical a requirement that the individual be able to take at least two unscheduled 15 to 20 minute breaks throughout the day, the VE stated there would be no jobs such a person could perform. (Tr. 490-491).

On June 5, 2015, the ALJ rendered his hearing decision. He first explained the five-step evaluation process used to determine disability. He then found that the plaintiff had severe impairments consisting of a back disorder, shoulder disorder, and an

9

adjustment disorder (Tr. 447). He then spent several pages describing the medical evidence set out hereinabove in great detail (Tr. 447-454).

While the ALJ found that the plaintiff had the severe impairments listed above, he found that she did not have an impairment or combination of impairments which met or equaled any listed impairment in 20 C.V.R. Part 404, Subpart P, Appendix 1. As part of this evaluation, he found that the plaintiff had a mild restriction in activities of daily living and in social functioning. With respect to concentration, persistence or pace, he found that she had moderate difficulties. He based these findings on the plaintiff's description of her activities and the opinions of Dr. Lanthorn and Dr. Bryant. (Tr. 455-456).

The ALJ then addressed the plaintiff's residual functional capacity ["RFC"] and found that she could perform a "significantly reduced range" of light work. Whereas, performance of the full range of light work requires considerable standing and walking and the ability to frequently lift 10 pounds and occasionally lift up to 50 pounds, the ALJ found that the plaintiff could only stand or walk for four hours and that her lifting capabilities were limited to 5 pounds frequently and 30 pounds infrequently. (Tr. 456). He also limited her to simple tasks due to her mental impairment. (Tr. 456). He then explained his duty to determine the existence of physical or mental impairments which could cause plaintiff's symptoms, and the actual effects of those conditions on the plaintiff. In that regard, he must determine her credibility. (Tr. 456-457). The Court notes that the ALJ had already stated that, in determining the plaintiff's RFC, he was

required by the regulations to consider not only those impairments he found to be severe, but the impact of all of the plaintiff's impairments, "including impairments that are not severe…." (Tr. 447).

The ALJ then proceeded to again discuss the medical evidence and his observations based upon it, but this time he addressed each impairment asserted by the plaintiff irrespective of whether he found it to be severe. In this regard, he discussed the evidence relating to the plaintiff's back problems, alleged diabetes, carpal tunnel and "flow" tunnel symptoms, migraines, and her depression. (Tr. 457-458). He discussed the plaintiff's daily activities. While noting that these activities were limited, he found they were not consistent with the level of restriction that she claimed to have. In light of all of this, he found that the plaintiff's allegations of disabling pain and other symptoms were not fully credible or supported by the evidence of record. (Tr. 458).

He then discussed the weight he gave to the opinion evidence. He gave some weight to Dr. Breeding's opinion, noting the many normal findings he made during his consultative physical examination of the plaintiff. The ALJ gave little weight to Dr. Baumrucker's report for a variety of reasons. First, the ALJ said it was unclear if the limitations he found, such as only being capable of lifting no more than 10 pounds infrequently or only standing for 5 minutes were Dr. Baumrucker's limitations or were self-reported by plaintiff. He stated that Dr. Baumrucker's opinion that the plaintiff could not perform light activities was contradicted by her testimony. He felt that Dr. Baumrucker's opinion that the plaintiff could not work at any level was not supported by

11

Dr. Baumrucker's exam findings or by the other objective evidence. He gave great weight to the opinion of Dr. Blaine who also performed a consultative exam of the plaintiff, finding it was consistent with the other evidence in the record. Finally, he gave great weight to Dr. Lanthorn's opinions. (Tr. 459).

The ALJ considered plaintiff's obesity, noting findings from her physical exams relating to getting on and off the exam table and her breathing. He stated that he factored her obesity in with her other impairments in arriving at his reduced RFC finding. He then stated that his RFC fining was supported by the opinions of Dr. Blaine and Dr. Lanthorn, and that plaintiff's allegations that she was more limited were no supported by the record. (Tr. 460).

The ALJ then found that the plaintiff could not perform her past relevant work. However, he also found that there were a substantial number of jobs the plaintiff could still perform in the national economy based upon the testimony of the VE. Accordingly, he found that she was not disabled. (Tr. 461-462).

Plaintiff asserts that the ALJ erred in two respects. First, she states that the ALJ's RFC finding that the plaintiff can engage in a limited range of light work is not supported by substantial evidence. In particular, she asserts that the ALJ erred in relying on the opinion of Dr. Blaine, because Dr. Blaine did not have the benefit of all of plaintiff's medical records, including MRI studies, when he examined plaintiff and opined as to her exertional capabilities. Second, plaintiff asserts that the ALJ erred by not finding plaintiff's carpal tunnel syndrome and Quervain's syndrome as severe impairments, and

12

did not consider the limitations imposed by plaintiff being diagnosed with these conditions in determining her RFC.

It is clear that the ALJ did not find plaintiff's carpal tunnel syndrome and Quervain's syndrome to be severe impairments. As stated by plaintiff, the ALJ at the second step of the evaluation process only found the plaintiff's back disorder, shoulder disorder and adjustment disorder to be "severe." (Tr. 447). An impairment is "severe" if it more than minimally impacts a plaintiff's ability to work. It must significantly limit the ability to perform basic work activities such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, and speaking. 20 C.F.R. §§ 404.1521, 416.921, Social Security Ruling ["SSR"] 96-3p, and *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987). Unless an ALJ finds a severe impairment, the sequential analysis ends at step two.

However, a failure to find any particular impairment to be severe is not a per se fatal flaw. If a claimant is found to have *any* severe impairment, before proceeding to step four, an ALJ must consider the effects of *all* of a claimant's impairments in formulating the RFC, including those that were not found to be severe impairments at step two. 20 C.F.R. §§ 404.1520, 1545, 416.920, and 945, and SSR 96-8p.

Thus, since the ALJ did find severe impairments moving plaintiff's case past step two, the issue becomes whether he actually considered the effects of these impairments, as he acknowledged is required by the law, and whether there is substantial evidence to support his finding regarding the limitations imposed by them. The ALJ stated his

13

rationale in this regard as follows:

> In terms of her alleged carpal tunnel and flow tunnel, the record indicates the claimant had carpal tunnel surgery in the remote past. However, the record does indicate an assessment of de Quervain's tenosynovitis and osteoarthritis of the thumb, for which she was prescribed splints and medication. Despite this, she is still able to perform daily activities including washing dishes, doing laundry, cooking, and folding laundry. Although Dr. Blaine diagnosed carpal tunnel syndrome based on the claimant's report, he gave no manipulative limitations.

(Tr. 457).

Independent of the question of the weight he gave to Dr. Blaine, which is the subject of plaintiff's other assignment of error, the ALJ did consider the effects of these two conditions in detail. He considered the fact that these conditions were predominately in the plaintiff's non-dominant hand, and that plaintiff herself continued to perform her activities of daily living (Tr. 794). Dr. Blaine was aware of this both from plaintiff's stated history (Tr. 840) and the diminished right hand grip strength on examination (Tr. 842). With those findings, Dr. Blaine limited the plaintiff to lifting five pounds frequently and thirty pounds infrequently. *Id.*

Given the seriousness of the restrictions found by Dr. Blaine, the Court believes that the ALJ erred in not finding these conditions to be severe. However, the Court also is of the opinion that any such error was harmless because of the depth of the ALJ's analysis of the limitations imposed by them at step four and Dr. Blaine's support for those limitations. *See, Kirkland v. Comm'r of Soc. Sec.*, 528 Fed. App'x 425, 427 (6th Cir. 2013)("[S]o long as the ALJ considers all of the individual's impairments, the failure to find additional severe impairments ... does not constitute reversible error)(citations and

14

quotations omitted); see also *Fisk v. Astrue*, 253 Fed. App'x 580, 583 (6th Cir. 2007). The ALJ considered all the plaintiff's impairments in reaching its final conclusion that she was not disabled.

Plaintiff also argues that the RFC finding lacks the support of substantial evidence, and that the ALJ relied exclusively on the report of Dr. Blaine. In this regard, plaintiff asserts that Dr. Blaine's opinion lacked the necessary foundational support because it is unclear what records of the plaintiff's treatment he reviewed, particularly the various MRI reports. At the very least, plaintiff argues that under the regulations, the ALJ should have seen to it that those records were provided to Dr. Blaine, and that he "prepare a revised report." *See* 20 C.F.R. § 404.1519(p). Also, plaintiff states that the ALJ did not give sufficient weight to the opinion of Dr. Baumrucker. Plaintiff refers to the earlier decision of the Court regarding the plaintiff's earlier applications, *France v. Colvin*, No. 2:13-CV-198, Doc. 20 (E.D. Tenn. July 7, 2014). Plaintiff asserts that the present reliance on Dr. Blaine is akin to the ALJ having relied upon the State Agency physician, Dr. Misra, in that earlier case.

In the first instance, the ALJ did not rely exclusively on the report of Dr. Blaine. His reliance on Dr. Blaine was based upon the ALJ's belief that the medical evidence and plaintiff's daily activities supported the opinion of Dr. Blaine. While the opinion of Dr. Blaine was essential to provide medical expert support for the ALJ's RFC finding, it was not the sole evidence.

Plaintiff states that Dr. Blaine's opinion is deficient because he did not appear to

15

have all of the plaintiff's records before him, and that his opinion suffers from the same lack of foundation as did the opinion of Dr. Misra in the earlier case which led to a remand. However, a fair reading of the earlier decision shows a compelling difference. Dr. Misra, a non-examining State Agency physician, was the sole medical support for the ALJ's RFC finding in that case. He had no other source other than the medical records upon which to base his opinion. Dr. Misra instead made the incredible finding that the plaintiff could perform the exertional requirements of medium work, including lifting up to 50 pounds up to one-third of an eight hour workday.

The difference between Dr. Blaine and Dr. Misra is that Dr. Blaine actually gave the plaintiff an extensive physical examination. He was also obviously aware of much of the plaintiff's medical history. The case was remanded because this Court did not believe that the report of State Agency physician relying on only a portion of the medical history who had never laid eyes on the plaintiff could constitute substantial evidence for an RFC finding. The Court stated "[o]bviously, a non-examining physician has no frame of reference other than the medical reports and tests, and must establish the veracity of their opinions based upon their thorough and logical consideration of that evidence. They themselves have not taken a claimant's pulse, rotated a claimant's shoulder, listened to them breathe, felt or viewed a muscle spasm, or tested their grip strength. They must rely on the reports of those who have." *Id.*, [Doc. 18, pg. 9]. That is simply not the case here. Dr. Blaine's report was not inadequate or incomplete, so no remand is required as suggested by the plaintiff. The ALJ found nothing inconsistent with Dr. Blaine's

16

findings in the other evidence in the record, save the opinion of Dr. Baumrucker. There is no need for him to prepare a revised report.

As for Dr. Baumrucker's assessment, as stated in the earlier case, it "puts plaintiff in a near invalid state." *Id*. The ALJ found that this was inconsistent with plaintiff's activities of daily living, Dr. Blaine's report, and the medical records of her treating sources. The plaintiff has severe impairments which impose great restrictions on what she can physically do. The ALJ so found. He, as the trier of fact, had the right to give little weight to Dr. Baumrucker in light of this other evidence. He gave adequate reasons for his findings in that regard.

The Court finds that there was substantial evidence to support the RFC finding of the ALJ. Any legal errors were rectified by the ALJ by his consideration of all of the plaintiff's impairments, whether considered severe or not, and are, thus, harmless. It is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 19] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 24] be GRANTED.[1]

Respectfully submitted,

s/ Clifton L. Corker
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).